Below is the Order of the Court.

*Paul B. Snyder*
_____
**Paul B. Snyder**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

1
2
3
4
5
6
7

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

8
9
10

In re:

BRIAN JOHN BRYCE and
CATHERINE GRACE BRYCE,

                    Debtors.

BRIAN JOHN BRYCE and
CATHERINE GRACE BRYCE,

                    Plaintiffs,

        v.

BRETT THOMAS LAWRENCE and JANE DOE
LAWRENCE, husband and wife and their marital
community; JAMES SPOONER and JANE DOE
SPOONER, husband and wife and their marital
community; and EXCEL FUNDING, INC., a
corporation licensed to do business in the State
of Washington.

                    Defendants.

Case No. 09-48516

Adversary No. 10-04099

**MEMORANDUM DECISION**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

        Trial was held in this matter on September 10, 11, 12, November 19 and 20, and December 14,

2012. Brian John Bryce and Catherine Grace Bryce (Plaintiffs) seek judgment against Brett and Jane

Doe Lawrence, husband and wife; James and Jane Doe Spooner, husband and wife; and Excel

MEMORANDUM DECISION - 1

Funding, Inc. (collectively referred to as "Defendants").[1]  At the conclusion of the trial, the Court took the matter under advisement.  Based on the evidence, arguments of counsel, and pleadings submitted, this Memorandum Decision shall constitute findings of fact and conclusions of law pursuant to Fed R. Bankr. P. 7052.  In the event constitutional authority is determined to be lacking, this Court's proposed findings of fact and conclusions of law shall be submitted to the U.S. District Court for the Western District of Washington for entry of a final order or judgment as required by 28 U.S.C. § 157(c).

## PROCEDURAL HISTORY AND RELEVANT FACTS

The Plaintiffs own real property and improvements purchased in 1990 and located at 21447 Bucoda Hwy SE, Centralia, Washington (Property).  In September 2006, the Plaintiffs were in default on their residential mortgage loan held by Centex Home Equity Company (Centex).  The monthly mortgage payment on the Centex loan was approximately $711, and the balance owing was approximately $82,170.  The Plaintiffs are unsophisticated in finance.  Ms. Bryce is currently employed in the restaurant business and attended one year of college.  Mr. Bryce is employed as a woodworker and has a high school education.  This appears to be the first home they have purchased.

In September 2006, the Plaintiffs contacted Defendant James Spooner (Spooner) at Excel Funding, Inc. (Excel) about refinancing the Centex residential mortgage loan on their Property.  The Plaintiffs were referred to Spooner by loan officers at Washington Mutual Bank when they attempted, but did not receive, conventional refinancing.  Excel is owned entirely by Defendant Brett Lawrence (Lawrence).

Spooner received the necessary financial information concerning the Plaintiffs over the telephone and used it to prepare a Uniform Residential Loan Application, subsequently signed by the Plaintiffs on October 18, 2006.  An appraisal was performed on the Property, and Spooner testified that he advised the Plaintiffs that some basic home repairs would need to be completed.  There was

---

[1] In the Order on Defendants' Motion to Dismiss Adversary Proceeding entered February 14, 2011, the Court dismissed all claims against the separate property of Jane Doe Lawrence. In closing arguments, counsel for the Plaintiffs indicated that the Plaintiffs are likewise not pursuing any claims against the separate property of Jane Doe Spooner.

MEMORANDUM DECISION - 2

no evidence presented by either party as to the exact cost or extent of the repairs requested. The appraisal obtained by Spooner valued the Plaintiffs' Property at $210,000.

After obtaining the requisite financial information, Spooner advised the Plaintiffs that he was unable to find a conventional lender willing to refinance the loan, but that they might be able to obtain refinancing through a private lender. Unbeknownst to the Plaintiffs, the private lender that Spooner had in mind was Brett Lawrence, the owner of Excel. Spooner acknowledged that he did not meet with the Plaintiffs prior to closing, nor did he go over or explain the paperwork that they would need to sign at closing. Further, Lawrence never met or talked with the Plaintiffs prior to closing the loan. Before signing, the Plaintiffs did receive through the mail and signed on October 18, 2006, a Good Faith Estimate, an Estimated HUD-1 Settlement Statement, and a document captioned "New Loan-Notice of Right to Cancel."

On or about October 23, 2006, the Plaintiffs attended a "Courtesy Signing" of the loan documents at Stewart Title Company of Lewis County (Stewart Title). The Plaintiffs did not receive copies of the documents to be signed or many of the required disclosures prior to closing, nor was Spooner, Lawrence or anyone involved in the preparation of the loan documents available to assist them or answer their questions at closing. The closing was attended by one of Stewart Title's Limited Practice Officers, who was not familiar with the transaction, could not render advice, and merely handed them the original documents to be signed. As they departed, the Plaintiffs received unsigned copies of the documents they believed had just been signed.

The basic terms of the Promissory Note signed by the Plaintiffs are as follows: principal loan amount of $117,000; fixed interest rate of 12%; monthly principal and interest payment of $1,210.68; monthly payment to begin December 1, 2006; balloon payment due April 1, 2008; balloon payment default penalty of $6,000; a five year prepayment penalty of six month interest unless refinanced through Excel; late fee charge of $60.53 if any one installment payment was more than five days late; and a default interest rate of 18%. The Plaintiffs testified that although they had defaulted on the Centex loan where payments were almost $500 less per month, they thought they could reduce their

MEMORANDUM DECISION - 3

personal expenses to afford this new increased loan payment. The Plaintiffs also believed that they would be able to refinance at a lesser rate prior to or soon after April 1, 2008, the due date of the loan, particularly considering the equity they felt they had in the Property and given that they would have established a satisfactory payment history. The Plaintiffs testified that they believed that this loan was their only option for saving their Property from foreclosure by Centex. It is unclear as to the promises, if any, Spooner made as to the Plaintiffs' ability to refinance.

According to one of two "Final" unsigned HUD-1 Settlement Statements (Settlement Statement) dated October 23, 2006, the following fees were associated with the loan and paid to Excel: (1) an origination fee of $2,942.50; (2) $16 for a credit report (actual cost was $10.02); (3) $999 underwriting fee; and (4) $375 processing fee. Lawrence also received a "lender fee" of $4,708. The Settlement Statement also disclosed a "CONSTRUCTION HOLDBACK" of $2,915.65, and an "ADD'L CONSTRUCTION HOLDBACK" of $304.74.

There was a discrepancy between the Settlement Statement and the Promissory Note as to the principal amount of the loan. The Settlement Statement and Good Faith Estimate indicate that the principal amount of the loan from Lawrence was $117,700, while the Promissory Note states $117,000.

The Plaintiffs timely made payments during the term of the loan in excess of the required monthly payment. The required payment was $1,210.68, but the Plaintiffs generally tendered monthly payments of $1,215. The payments made by the Plaintiffs, however, were incorrectly recorded in Lawrence's account ledger as $1,210.68, resulting in a small underreporting of their payments. During this period, the Plaintiffs never received a monthly mortgage statement or escrow statement indicating that amounts were being held by Lawrence in his personal account as a "construction holdback." There is no indication of the purpose of either of the construction holdbacks in the documentation. These funds were never received by the Plaintiffs, but were instead held in an account under the control of Lawrence with interest being charged to the Plaintiffs as an amount still due and owing. The

MEMORANDUM DECISION - 4

Plaintiffs were unaware that Lawrence was holding these funds and charging them interest as an amount owed.

In May 2008, Mr. Bryce had a job slow down and the Plaintiffs were unable to make timely monthly payments in full; accordingly, the loan went into default. The Plaintiffs contacted Spooner and requested his assistance in obtaining immediate refinancing of the Lawrence loan. The Plaintiffs believed that because they had been current for the term of the loan, they would be able to get conventional financing. Spooner testified that he attempted to place the Plaintiffs with at least one lender, but was unsuccessful because needed repairs to the Property were never completed despite his requests and offers to help. Spooner never attempted to place them with a FHA lender because he believed they would not qualify.

After May 2008, the Plaintiffs' payments to Lawrence became sporadic and were generally for less than the normal installment payment. In July 2009, the Plaintiffs received a letter of default dated June 8, 2009. The default letter advised the Plaintiffs that a principal amount of $126,490.95 was now due and owing for failure to pay a balloon payment due April 1, 2009. The default letter also indicated that the Plaintiffs had incurred a late payment of $6,000 and additional attorney fees of $500. The total amount demanded by July 13, 2009, was $132,990.95.

A Trustee's Sale was scheduled for October 30, 2009. On October 29, 2009, the Plaintiffs, through counsel, sent Lawrence a Qualified Written Request. The Defendants responded on November 2, 2009, with an accounting of the requested loan payoff amounts. In comparing the requested information with the Defendants' response, it is clear that the Defendants' response was incomplete. For example, copies of the Defendants' loan file, signed copies of the closing papers, and construction account balance were not provided as requested. Further, Lawrence supplied the Plaintiffs' attorney with a payoff and breakdown of principal and interest indicating the Plaintiffs paid interest on the loan in 2008 of $8,639.61. No explanation was provided for why this amount differed from the amount stated as mortgage interest received from the Plaintiffs in 2008 on Form 1098 filed with the Internal Revenue Service. Form 1098 indicated that total interest paid was $8,913.45.

MEMORANDUM DECISION - 5

Lawrence was also unable to explain at trial why the IRS Form 1098 lists the lender on this loan as AAA Homes, one of Lawrence's other businesses, rather than Lawrence individually.

The Defendants subsequently filed a complaint against Lawrence and additional defendants on October 30, 2009, in U.S. District Court for the Western District of Washington. The Defendants filed a Chapter 13 petition in U.S. Bankruptcy Court for the Western District of Washington on November 12, 2009. The complaint filed in U.S. District Court was administratively closed on December 21, 2009. On January 14, 2010, Lawrence filed a proof of claim in the Debtors' bankruptcy case in the amount of $145,552.55. On April 27, 2010, the Defendants filed the present adversary proceeding. A First Amended Complaint for Declaratory Relief and Damages was filed on September 17, 2010.

On April 10, 2012, Lawrence filed a motion to withdraw reference of this adversary proceeding pursuant to 28 U.S.C. § 157(d). An order denying Lawrence's motion to withdraw reference was entered by the U.S. District Court for the Western District of Washington on June 26, 2012.

II

DISCUSSION

At trial, the Plaintiffs indicated that they are pursuing twelve separate claims against the Defendants. These claims can be broken down into three categories: federal statutory claims, Washington State statutory claims and Washington State common law claims. The federal statutory claims are for violations of the Truth in Lending Act (TILA), Home Ownership Equity Protection Act (HOEPA) and Real Estate Settlement Protection Act (RESPA). The Washington State statutory claims are for violations of the usury statute, Mortgage Brokers Practices Act (MBPA), and Consumer Protection Act (CPA). The Washington State common law claims are for unconscionability, civil conspiracy, breach of fiduciary duty, misrepresentation and fraud, breach of the duty of good faith and fair dealing, breach of contract and for attorney's fees. If liability is established, the Plaintiffs seek to reduce or offset any damages awarded against the proof of claim filed by Lawrence.

MEMORANDUM DECISION - 6

## A. Federal Statutory Claims

### 1. Recoupment

#### a. Statutory Damages

The Defendants have raised as a defense to several of the Plaintiffs' claims that such claims are barred by the statute of limitations. It is undisputed that the statute of limitations on several of the Plaintiffs' statutory claims has expired. The Court, however, ruled in the Order on Defendants' Motion to Dismiss Adversary Proceeding entered on February 14, 2011 (Order on Motion to Dismiss), that such claims may still be raised by way of recoupment.

Courts have held that certain statutory claims, including those under TILA, may be raised defensively after the limitations period has expired. In order to maintain a claim for recoupment, the debtor must show that (1) the alleged violation and the creditor's debt claims arose from the same transaction, (2) the debtor is asserting the claims as a defense, and (3) the main action is timely. Smith v. Am. Fin. Sys., Inc. (In re Smith), 737 F.2d 1549, 1553 (11th Cir. 1984). To meet a recoupment exception to the statute of limitations, the party must establish that the claim was brought in response to an action to collect a debt. The fact that the debtor is the plaintiff in an adversary proceeding does not preclude a finding that the claim was raised defensively.

In the Order on Motion to Dismiss, this Court determined that the "main action" in this case was the filing of the proof of claim, which was timely filed. Thus, the Plaintiffs are not prohibited from raising these claims by way of recoupment. Such claims, however, may only be raised as a defense to the filed proof of claim and consequently, Plaintiffs are unable to seek affirmative relief by way of recoupment. The Plaintiffs have agreed through their counsel on several occasions that they are not seeking affirmative relief.

As these claims may be raised by way of recoupment, it is unnecessary for the Court to rule as a general matter whether the statute of limitations has been equitably tolled. The Plaintiffs admitted during closing arguments that this was an alternative theory and that they did not intend to proceed under equitable tolling if recoupment is determined to be available. Any equitable tolling arguments

MEMORANDUM DECISION - 7

regarding specific claims, however, will be addressed in this Memorandum Decision when deciding the individual claims.

### b. Rescission

In addition to statutory damages, the Plaintiffs also allege that rescission may be obtained through recoupment. "Rescission essentially restores the status quo ante; the creditor terminates its security interest and returns any monies paid by the debtor in exchange for the latter's return of all disbursed funds or property interests." McKenna v. First Horizon Home Loan Corp, 475 F.3d 418, 421 (1st Cir. 2007) (citation to the statute omitted).

With respect to TILA, this Act confers upon a debtor the right to rescind within three days of the transaction's consummation or three days from delivery of the material disclosures, whichever occurs later. 15 U.S.C. § 1635(a). The creditor must clearly disclose the rescission right to the debtor. 15 U.S.C. § 1635(a). If a creditor fails to deliver any of the required material disclosures, including notice of the right to rescind, the debtor may rescind at any time up to three years following the consummation of the transaction. 15 U.S.C. § 1635(f).

The Plaintiffs admit that any right they had to rescind the transaction expired three years following the consummation of the transaction, or three years from October 23, 2006. 15 U.S.C. § 1635(f). Thus, the time limit expired prior to the filing of this adversary complaint on April 27, 2010.

Despite the fact that the time limit for exercising this right has expired, the Plaintiffs argue that they can still assert a right to rescind as a defense in recoupment. The United States Supreme Court (Supreme Court), however, has examined this precise issue and ruled that "the Act permits no federal right to rescind, defensively or otherwise, after the 3-year period of § 1635(f) has run." Beach v. Ocwen Fed. Bank, 523 U.S. 410, 419, 118 S.Ct. 1408, 1413 (1998). Accordingly, the Plaintiffs may not obtain rescission through recoupment under federal law.

The Plaintiffs argue that even if rescission is unavailable under federal law, it is still available under Washington State law. Congress's intent to preserve state law rights to rescind in foreclosure

MEMORANDUM DECISION - 8

proceedings is evidenced by 15 U.S.C. § 1635(i)(3), which states: "[n]othing in this subsection affects a consumer's right of rescission in recoupment under State law." 15 U.S.C. § 1635(i)(3).

Although TILA preserves a consumer's right to rescission in recoupment under state law, it does not "create" this right. See DiVittorio v. HSBC Bank USA, N.A. (In re DiVittorio), 670 F.3d 273, 286 (1st Cir. 2012); Johnson v. Long Beach Mortg. Loan Trust 2001-4, 451 F.Supp.2d 16, 51 (D.D.C. 2006) (noting that 15 U.S.C. § 1635(i)(3) does not expand any rights under state law). The Plaintiffs have failed to point to any statutory provision or caselaw to establish that a right of rescission in recoupment exists under Washington State law. Although recoupment may be available under Washington State law, there is no evidence that rescission by way of recoupment similarly exists. Compare Fidler v. Central Coop. Bank (In re Fidler), 226 B.R. 734, 737 (Bankr. D. Mass. 1998) (concluding that specific language in a Massachusetts statute permitted a borrower to assert rescission as a defensive recoupment claim), with Williams v. EMC Mortg. Co. (In re Williams), 276 B.R. 394, 397 (Bankr. E.D. Pa. 2002) (concluding that a right of rescission in recoupment did not exist under Pennsylvania law.). As in Williams, the Plaintiffs have failed to establish that Washington State law recognizes a right of rescission in recoupment.

The Court would also note that the time period of 15 U.S.C. § 1635(f) cannot be equitably tolled. As indicated by the Supreme Court in Beach, 15 U.SC. § 1635(f) is not a statute of limitation. Beach, 523 U.S. at 416-18. Accordingly, this time period is not subject to equitable tolling. See Taylor v. Money Store, 42 F.App'x 932, 933 (9th Cir. 2002); Williams, 276 B.R. at 398; Roberson v. Cityscape Corp. (In re Roberson), 262 B.R. 312, 319 n.8 (Bankr. E.D. Pa. 2001).

For each of the reasons stated above, the Court concludes that Plaintiffs' right to rescission has expired and may not be raised defensively by way of recoupment.

## 2. Truth in Lending Act

### a. Liability

The stated purpose of TILA is to promote consumers' "informed use of credit" by requiring "meaningful disclosure of credit terms." 15 U.S.C. § 1601(a). TILA is a federal remedial statute that

requires strict compliance. Further, TILA is to be liberally interpreted in favor of the consumer. Rossman v. Fleet Bank (R.I.) Nat'l Ass'n, 280 F.3d 384, 390 (3d Cir. 2002).

TILA applies to an individual or business that offers or extends credit when four conditions are met: (i) the credit is offered or extended to consumers; (ii) the offering or extension of credit is done regularly; (iii) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (iv) the credit is primarily for personal, family, or household purposes. See 12 C.F.R. § 226.1(c).

There is no dispute that the Plaintiffs are "consumers" under TILA, or that the transaction at issue was made primarily for personal, family, or household purposes. The Defendants, however, argue that the Plaintiffs' claims under TILA fail because none of the Defendants meet the definition of a "creditor," and thus the Plaintiffs cannot establish the second and third elements. If the Court determines that Lawrence is a "creditor" as defined by TILA, then the loan transaction is subject to TILA and possibly, HOEPA, disclosure requirements. See 15 U.S.C. § 1602(f);[2] 12 C.F.R. § 226.2(a)(17)(i).

According to the definition in effect at the time the loan was consummated, a "creditor" for purposes of TILA and HOEPA means: "A person who (A) regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a down payment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract." 12 C.F.R. § 226.2(a)(17)(i) (effective to July 29, 2009).

Regulation Z, which was promulgated by the Federal Reserve Board to implement TILA, further provides:

> A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of § 226.32) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not

---

[2] 15 U.S.C. § 1602(f) has since been redesignated as 15 U.S.C. § 1602(g). Pub. L. No.111-203, 124 Stat. 1376 (July 21, 2010).

meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 226.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. § 226.2(a)(17)(i) n.3 (effective to July 29, 2009). See also 15 U.S.C. § 1602(f) (effective to August 13, 2008).

The Plaintiffs argue that Lawrence is a creditor as defined by 12 C.F.R. § 226.2(a)(17) because he originated one or more credit extensions through a mortgage broker. This last sentence, which expands the definition of "creditor," was added by Congress when enacting HOEPA in 1994 as amendments to TILA. Pub. L. No. 103-325, 108 Stat. 2160 (1994). According to the Plaintiffs, TILA applies because the loan originated through Spooner and Excel, whom for purposes of this transaction were working with Lawrence. Spooner, through Excel, was acting as the "mortgage broker."

The term "mortgage broker" was not a defined term under TILA when this loan was made. It became a defined term in October 2009, through Regulation Z. See 12 C.F.R. § 226.36 (effective Oct. 1, 2009). The term was further defined by amendment effective April 1, 2011. See 12 C.F.R. § 226.36(a)(1) and (2) (effective April 1, 2011). Regulation Z currently defines a "mortgage broker" as "any loan originator that is not an employee of the creditor." 12 C.F.R. 226.36(a)(2) (effective April 1, 2011). A "loan originator" is defined as "a person who for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranges, negotiates, or otherwise obtains an extension of consumer credit for another person." 12 C.F.R. § 226.36(a)(1) (effective April 1, 2011). Although neither of these definitions were in place when the loan was entered into, it is proper for this Court to examine them for guidance, particularly as this "definition, although new to TILA, is consistent with how courts defined and applied the term before its adoption." Bird v. Winterfox, LLC (In re Kitts), 442 B.R. 818, 827 (D. Utah 2010).

It is undisputed that Spooner assisted in the preparation of the documents for this loan and arranged the funding through Lawrence. He was also paid a commission of 70% of the loan fee. Spooner meets, and has acknowledged that he meets the definition of a loan originator. At issue is

MEMORANDUM DECISION - 11

whether Spooner was an employee of Lawrence/Excel. If so, he does not meet the definition of a mortgage broker.

The Defendants argue that Spooner was an employee of Lawrence/Excel based on the fact that several attributes of the employer/employee relationship were present. For example, the evidence presented suggests that Lawrence/Excel set Spooner's work hours and dictated other aspects of his work day, including prohibiting him from working from home. Lawrence/Excel also provided his office equipment, and Spooner's office was physically located on Excel's premises.

Although the Court agrees that some evidence of an employee/employer relationship exists, the more credible evidence indicates that Spooner was an independent contractor. For instance, Plaintiffs' Exhibit 70 is a signed agreement between Spooner and Excel made pursuant to the MBPA, which specifically identifies Spooner as an independent contractor. This agreement was also signed by other loan originators who worked for Excel. It is also undisputed that Excel supplied Spooner with an IRS Form 1099 at the end of the year rather than an IRS W-2 form, indicating that Excel classified Spooner as an independent contractor rather than an employee for federal tax purposes. Further, Lawrence acknowledged at his deposition taken on May 11, 2011, that each of the loan originators working at Excel was an independent contractor. Plaintiffs' Ex. 16, Lawrence Dep. 105:1-6. Although not dispositive, the Court also found Plaintiffs' Exhibit 69 helpful to resolving this issue, which is a business card containing Spooner's name and a title of Mortgage Broker.

Based on a preponderance of the evidence and testimony provided, the Court concludes that Spooner was not an employee of Lawrence or Excel. Although some attributes of an employee/employer relationship are present, the weight of the evidence indicates that the parties held Spooner out to be an independent contractor. There is no indication that Excel paid withholding tax, unemployment compensation or labor and industry premiums for any of the persons working for it as loan originators. The Defendants cannot have it both ways and alter the parties' relationship when it suits their goals. For purposes of state law, including the MBPA, and federal law, for federal taxes, the Defendants filed documents and signed agreements acknowledging Spooner's status as an

MEMORANDUM DECISION - 12

independent contractor. This Court agrees with that characterization and concludes that Spooner was not an employee of Lawrence or Excel for purposes of TILA. Accordingly, TILA applies to this loan transaction.

The Defendants admit that the TILA required disclosures were not made in this case. It is undisputed that the Defendants never provided the TILA required disclosure of the annual percentage rate (APR), total amount financed, total finance charge or payment schedule to the Defendants. See 15 U.S.C. § 1605; 15 U.S.C. § 1638. Under TILA, these disclosures must be sent to the borrower within three days of signing the loan application. The Plaintiffs are therefore entitled to statutory damages for these violations.

The Plaintiffs also argue that the Defendants are liable under TILA for failure to rescind. As stated above, the time period for asserting a claim based on a right to rescind under TILA has expired and may not be raised defensively by way of recoupment.

### b. Damages

Under TILA, a creditor who fails to comply with any requirement under 15 U.S.C. § 1635, regarding a credit transaction not under an open end credit plan that is secured by real property or a dwelling, is liable for "not less than $200 or greater than $2,000." 15 U.S.C. § 1640(a)(2)(A)(iii).[3]

The Defendants argue that they should not be liable under TILA because any violation was unintentional. According to 15 U.S.C. § 1640(c), a creditor may not be held liable if the creditor "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error." 15 U.S.C. § 1640(c). This section, however, plainly states that "an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error." 15 U.S.C. § 1640(c).

---

[3] In 2008, Congress increased the statutory damages range to not less than $400 or greater than $4,000. See Housing and Economic Recovery Act of 2008, Pub.L. No. 110–289, § 2502, 122 Stat. 2654, 2857 (2008). "The language of the Housing and Economic Recovery Act does not reflect a congressional intent for the increase in the statutory damage range to apply retroactively." Palmer v. Ameribanq Mortg. Group, LLC, 2010 WL 3933273, *18 n.4 (E.D. Pa. Oct. 6, 2010). As the violations occurred prior to the amendment, the Plaintiffs' statutory damages are therefore limited to the pre-2008 amounts.

MEMORANDUM DECISION - 13

The Defendants' only stated excuse for failing to comply with TILA is that they were unaware that TILA applied to this loan transaction. As set forth in the Act, such a failure is not sufficient to avoid liability.

The Plaintiffs are entitled to damages for the Defendants' TILA violations. Pursuant to 15 U.S.C. § 1640(a)(2)(A)(iii), the amount of this damage award is capped at $2,000. The Plaintiffs admit that they are entitled to only a single award of statutory damages, despite the fact that multiple failures to disclose exist. See 15 U.S.C. § 1640(g). Thus, the Plaintiffs may reduce Lawrence's proof of claim by $2,000.

The Plaintiffs argue that they are also entitled to an additional damage award for the Defendants' failure to rescind. According to the Plaintiffs, damages for this violation are recoverable even where the rescission right is no longer available. In support, the Plaintiffs cite to the unreported case of Lal v. Am. Home Mortg. Servicing, Inc., 2009 WL 3126450 (E.D. Cal. Sept. 24, 2009). The Plaintiffs' reliance on the Lal case is misplaced. In Lal, the plaintiffs alleged TILA violations for both a failure to provide a Notice of Right to Cancel and failure to timely respond to the plaintiffs' rescission letter. The U.S. District Court granted the motion to dismiss, with leave to amend, on the claim for the original notice violations due to the plaintiffs' failure to allege that they were ready and able to tender the loan proceeds, but denied the motion to dismiss on the claim for failure to respond. The court's denial of the motion to dismiss on the claim for failure to respond was due to the defendant's failure to provide any authority that an offer to tender must be contained in the notice of intent to rescind. Lal, 2009 WL 3126450, at *2. Although Lal indicates that statutory damages might still be available for failure to respond even where the remedy of rescission may not be available, it does not stand for the proposition that such damages are available where a right to rescind is unavailable because the time limitation period has expired. Unlike in this case, there is no indication that the time period for seeking rescission had expired in Lal. If the time period for asserting a claim for failure to rescind has expired, it is illogical that a plaintiff would lose a right of rescission but still be entitled to damages. This Court concludes that once the time period has expired, remedies based on that claim are unavailable.

### 3. **Home Ownership Equity Protection Act**

#### a. *Liability*

HOEPA was enacted as an amendment to TILA "to address predatory lending practices targeted at vulnerable consumers." Eugene J. Kelly, Jr. et al., <u>An Overview of HOEPA, Old and New</u>, 59 Consumer Fin. L.Q. Rep. 203 (Fall, 2005). It created "a special class of regulated loans that are made at higher interest rates or with excessive costs and fees." <u>In re Cmty. Bank of N. Va.</u>, 418 F.3d 277, 304 (3d Cir. 2005).

A loan is subject to the more stringent disclosure requirements of HOEPA if the "total points and fees payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total loan amount, or $400." 15 U.S.C. § 1602(aa)(1)(B).[4] Similar to other sections of TILA, this portion of HOEPA is liberally construed in favor of the consumer. <u>Abels v. Bank of Am., N.A.</u>, 2012 WL 691790, at *10 (N.D. Cal. March 2, 2012).

According to the Plaintiffs' calculations, the "total points and fees" in this case equal 12.2% of the total loan amount. The Defendants argue that the "total points and fees" total 7.8%. Assuming that HOEPA applies, the Defendants admit that the required disclosures were not made.

The Court recognizes that the documentation in this case makes these calculations difficult. Introduced into evidence were several Settlement Statements, each containing slightly different numbers. The numbers in these Settlement Statements also differed from other relevant documents, such as the Promissory Note. As previously indicated, both the HUD-1 Estimated Settlement Statement and the HUD-1 Final Settlement Statement state that the principal loan amount for this transaction is $117,700, while the Promissory Note indicates that the principal loan amount is $117,000. For purposes of the HOEPA calculation, the Court has used the HUD-1 Final Settlement Statement as the best evidence of the loan amount and fees charged in this transaction. Presumably, by its nature the HUD-1 "Final" Settlement Statement is more reliable than a HUD-1 "Estimated"

---

[4] This statutory section has since been redesignated as 15 U.S.C. § 1602(bb)(1)(B). Pub. L. No. 111-203, § 1100A, 124 Stat. 2107 (2010).

MEMORANDUM DECISION - 15

Settlement Statement. Additionally, the Promissory Note amount cannot be used as it does not contain many of the terms required by the Court to calculate the various components in its analysis. As stated above, according to the HUD-1 Final Settlement Statement, the principal loan amount was $117,700. The principal loan amount, however is not the "total loan amount" for purposes of determining whether this is a HOEPA loan.

The Federal Reserve Board's Official Staff Commentary to Regulation Z explains that the "total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any costs listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 226.32(b)(1) and financed by the creditor." Official Staff Interpretation, 12 C.F.R. Pt. 226, Supp. I at 226.32(a)(1).

The amount financed is calculated by:

(1) Determining the principal loan amount or the cash price (subtracting any down payment);
(2) Adding any other amounts that are financed by the creditor and are not part of the finance charge; and
(3) Subtracting any prepaid finance charge.

12 C.F.R. § 226.18(b).

Accordingly, the Defendants have erred in calculating their numbers based on a total loan amount of $117,000. As stated above, the starting point for this analysis is not the total loan amount, but the amount financed. To arrive at the "total loan amount," any prepaid finance charge must first be subtracted from the principal loan amount.

Using the Defendants' numbers, the prepaid finance charge is, at a minimum, $9,040.50. This is the amount listed on the HUD-1 Final Settlement Statement as "Settlement charges to borrower" ($14,335.19) minus amounts stated as paid to third parties ($4,989.95) and minus the "Add'l Construction Holdback" ($304.74). For purposes of this analysis, the Court has assumed that each of the various charges, totaling $4,989.95, were paid to third parties as alleged. These amounts consist of the appraisal fee of $450, closing fee of $350, title insurance of $350, sales tax on escrow fee of $26.95, sales tax on title policy of $29.40, recording fees of $65, courier fee of $25, taxes of $3,585.70

MEMORANDUM DECISION - 16

and courtesy signing of $107.90. The Court has also assumed that amounts listed as a "Construction Holdback" and "Add'l Construction Holdback" should not be classified as a finance charge as alleged by the Plaintiffs. The Court has therefore also deducted the "Add'l Construction Holdback" amount of $304.74, to arrive at the minimum prepaid finance charge number of $9,040.50 asserted by the Defendants ($14,335.19- $4,989.95 - $304.74 = $9,040.50).

Accordingly, the total loan amount is calculated by subtracting $9,040.50 from $117,700, which equals $108,659.50. Eight percent of $108,659.50 is $8,692.76. If the total points and fees exceed $8,692.76, the loan is a high rate loan covered by HOEPA. If the Court accepts the Defendants' characterization of the various charges on the HUD-1 Final Settlement Statement, the total finance charges equal $9,040.50 and exceed the points and fees threshold of $8,692.76. If the Plaintiffs' arguments are accepted, the "total points and fees" include the construction holdbacks and equal, at a minimum, $12,260.89. The same is true if the Court uses the Promissory Note principal loan amount of $117,000 ($117,000 - $9040.50 = $107,959.50 x.08 = $8,636.76). Under each of these scenarios, the "total points and fees" exceed the threshold of $8,692.76 or $8,636.76, rendering this a HOEPA covered loan.

Although unnecessary to this analysis, as the Court concludes that HOEPA applies even if only the minimum points and fees are considered, the Court further notes that it does not agree with the Defendants' characterization of the construction holdbacks.

Under HOEPA, "total points and fees" on a mortgage means:

(A) all items included in the finance charge, except interest or the time-price differential;
(B) all compensation paid to mortgage brokers;
(C) each of the charges listed in section 1605(e) of this title (except an escrow for future payment of taxes), unless—
      (i) the charge is reasonable;
      (ii) the creditor receives no direct or indirect compensation; and
      (iii) the charge is paid to a third party unaffiliated with the creditor; and
(D) such other charges as the Board determines to be appropriate.

15 U.S.C. § 1602(aa)(4). 15 U.S.C. § 1605(e), in turn, lists the following fees:

(1) Fees or premiums for title examination, title insurance, or similar purposes.
(2) Fees for preparation of loan-related documents.

MEMORANDUM DECISION - 17

(3) Escrows for future payments of taxes and insurance.
(4) Fees for notarizing deeds and other documents.
(5) Appraisal fees, including fees related to any pest infestation or flood hazard inspections conducted prior to closing.
(6) Credit reports.

15 U.S.C. § 1605(e).

At trial, the evidence presented by the Defendants regarding the nature of the construction holdbacks was inconsistent and unpersuasive. The Defendants testified that this amount was set aside to provide funds for needed repairs on the Plaintiffs' home, but no repairs were ever undertaken. In addition, no evidence or documentation was provided to substantiate the need for such repairs or the parties' expectations regarding these funds. It is further undisputed that the funds were not provided to the Plaintiffs, but held in Lawrence's personal account and that Lawrence never disclosed to the Plaintiffs that such funds were being held and for what purpose. While being held in his account, interest was being earned on the funds, which Lawrence presumably received, but did not credit to the Plaintiffs. Interest was being earned on these funds despite the fact that the holdback was included in the total loan amount, requiring the Plaintiffs to pay interest on these funds as part of their monthly payment. In summary, the more credible evidence indicates that the construction holdbacks should be included in the finance charge and the total points and fees on this loan. When included, the total points and fees equal $12,260.89. The total loan amount is then $105,439.11 ($117,700 - $12,260.89), and the total points and fees are 11.6% of the total loan amount.

The Defendants admit that the required HOEPA disclosures were not made to the Plaintiffs. HOEPA requires that three days before a closing, the consumer receive a disclosure containing the APR, the monthly payment of the loan, the amount borrowed, the presence of a balloon payment, if applicable, and warnings about the risks of entering into a high cost home equity loan. See 15 U.S.C. § 1639. It is undisputed that the transaction also contains several HOEPA prohibited terms, including (1) a prepayment penalty; (2) default interest; and (3) a balloon payment. See 15 U.S.C. § 1639(c), (e) and (g). The Defendants have also failed to demonstrate compliance with 15 U.S.C. § 1639(h), which prohibits the practice of extending credit without regard to a consumer's ability to pay. The evidence

MEMORANDUM DECISION - 18

indicates it was highly unlikely, given the Plaintiffs' income and poor payment history on the Centex loan, that the Plaintiffs could afford the higher payments and balloon payment required by this transaction. The same is true of the Plaintiffs' ability to refinance. The five year prepayment penalty alone made it difficult, if not impossible, for the Plaintiffs to ever refinance by the due date without a substantial increase in their income. The Plaintiffs are therefore entitled to damages under HOEPA.

### b. Damages

Under HOEPA, the consumer is entitled to statutory damages pursuant to 15 U.S.C. § 1640. As with TILA, because the loan at issue was entered into prior to the 2008 amendments increasing the statutory damage award to $4,000, the Plaintiffs are limited to a cap of $2,000 for the disclosure violations. 15 U.S.C. § 1640(a) and (g). The Defendants have admitted that they did not provide several of the required HOEPA disclosures. The Plaintiffs, however, are entitled to only a single $2,000 award for multiple disclosure violations. 15 U.S.C. § 1640(g).

The Plaintiffs are also entitled to statutory damages for each of the substantive violations. Unlike the restriction limiting a consumer to a single recovery for multiple failures to disclose, there is no such restriction for multiple violations of the substantive prohibitions of HOEPA. See Belmont v. Assocs. Nat'l Bank (Delaware), 219 F.Supp.2d 340, 344-46 (E.D.N.Y. 2002). As stated above, this transaction contained three prohibited terms and one prohibited practice. The Plaintiffs are therefore entitled to an additional statutory award of $8,000 ($2,000 x 4).

A consumer may also be entitled to special enhanced damages for violations of 15 U.S.C. § 1639, pursuant to 15 U.S.C. § 1640(a)(4), unless the creditor demonstrates that the failure to comply was not material. These enhanced damages include all finance charges paid by the consumer. As stated above, the total finance charge and fees paid by the Plaintiffs based upon the HUD-1 Final Settlement Statement are $12,260.89.

In incorporating the materiality defense, Congress's primary concern was to not penalize for inadvertent violations where the error was based on a simple miscalculation or other mistake and where the creditor maintained procedures to catch errors. In evaluating whether a failure was

MEMORANDUM DECISION - 19

material, the Court can be guided by caselaw interpreting the bona fide error defense codified in 15 U.S.C. § 1640(c). See H.R. Conf. Rep. No. 103-652 (1994), reprinted in 1994 U.S.C.C.A.N. 1977, 1992.

Each of the prohibited terms and practices of 15 U.S.C. § 1639 is considered material for a consumer in making an informed decision in credit transactions, otherwise the prohibition would not be included. In this case, it is undisputed that the transaction at issue contained three prohibited terms and one prohibited practice. The Defendants have failed to provide any evidence that such terms and practice were not material. Nor is it a defense to liability that the Defendants were unaware that this was a HOEPA covered loan. As with TILA, ignorance is insufficient to escape liability.

Unlike the cap on damages for disclosure violations, the Plaintiffs argue that there is no statutory cap for multiple violations of the substantive prohibitions of 15 U.S.C. § 1639. As the Defendants violated four substantive prohibitions, the Plaintiffs seek four separate awards of enhanced damages, or $49,043.56 ($12,260.89 x 4). This Court disagrees. The enhanced damages provision of 15 U.S.C. § 1640(a)(4) is limited by its own terms to the sum of all finance charges and fees "paid by the consumer." As a result, the Plaintiffs can only recover an amount equal to what they have paid. See Nat'l Consumer Law Center, Truth in Lending § 9.6.11.1.4 (7th ed. 2010). In this case, the Plaintiffs paid the sum of $12,260.89 in finance charges and fees. Including the $2,000 awarded for the disclosure violations and $8,000 for the substantive violations, the total liability under HOEPA equals $22,260.89.

### 4. Real Estate Settlement Protection Act

RESPA authorizes the Secretary of Housing and Urban Development to develop a standard real estate settlement form to be utilized in federally related mortgage loans. 12 U.S.C. § 2603(a). It requires that lenders and mortgage brokers make several disclosures, including issuing a borrower a HUD-1 statement. The costs of settlement must be disclosed to the borrower prior to closing by means of a standard form. 12 U.S.C. § 2605. In addition, the lender must complete and make available to the borrower either before or at settlement this uniform statement reflecting the actual

MEMORANDUM DECISION - 20

settlement costs. 12 U.S.C. § 2603(b). RESPA also prohibits kickbacks and unearned fees in real estate transactions involving federally related mortgage loans. 12 U.S.C. § 2607.

The Plaintiffs allege the following violations of RESPA: (1) payment of kickbacks and unearned fees; (2) failure to properly maintain an escrow account; (3) failure to provide a Controlled Business Notice; (4) misapplication of payments; and (5) failure to respond to a Qualified Written Request.

### a. Kickbacks and Unearned Fees

Kickbacks and referrals are prohibited by 12 U.S.C. § 2607(a), which provides that no person shall give and no person shall accept any fee, kickback, or other thing of value pursuant to any oral or written agreement or understanding for the referral of a settlement service. 12 U.S.C. § 2607(b) prohibits the giving or accepting of any portion, split, or percentage of any charge for services not actually performed. The private remedy for a violation of this provision is treble damages and attorney fees.

The Plaintiffs allege that Spooner received a prohibited kickback in this transaction. One of the declared purposes of RESPA is to "effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). There is no evidence that Spooner received a referral fee from Lawrence. It is undisputed that Spooner provided services in originating this loan and consummating the transaction. 12 U.S.C. § 2607(c) specifically provides that it is not a violation of RESPA for a lender to pay a fee to its agent for services actually performed in the making of a loan. Based on the evidence provided, the Court concludes that the fees received by Spooner did not violate RESPA.

### b. Escrow Account

The Plaintiffs allege that the Defendants violated RESPA in failing to properly maintain an escrow account. Specifically, this claim relates to the funds designated as a "Construction Holdback." Lawrence admits that these funds were deposited into his personal account rather than a separately designated escrow account. Although the Court agrees with the Plaintiffs that such funds should have

MEMORANDUM DECISION - 21

been placed in escrow, the Plaintiffs have failed to demonstrate how such failure is a violation of RESPA.

RESPA has two statutory sections that govern escrow accounts, 12 U.S.C. § 2605(g) and 12 U.S.C. § 2609. 12 U.S.C. § 2605(g) governs the administration of escrow accounts and provides that if a federally related mortgage loan requires the borrower to make payments into an escrow account, the "servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due." In this case, there is no allegation that the servicer failed to make payments from an escrow account as the payments become due. The cause of action is, instead, that the Defendants failed to deposit the "Construction Holdback" funds into a properly maintained escrow account.

12 U.S.C. § 2609 contains limitations on the amount of advance deposits a lender may require a borrower to deposit into an escrow account. This section also sets forth a servicer's duty to provide escrow account statements. See 12 U.S.C. § 2609(c). Although the manner in which the Defendants handled these funds may violate other laws, nothing in either of these sections specifically required the Defendants to deposit the construction holdback funds into an "escrow account" or even that such funds be separately segregated. The Court would further note that the Plaintiffs have failed to establish that there is a private right of action for violation of 12 U.S.C. § 2609. See Birkholm v. Wash. Mut. Bank, 447 F.Supp.2d 1158, 1162-63 (W.D. Wash. 2006). Thus, there is no authority for this Court to award the Plaintiffs damages pursuant to 12 U.S.C. § 2609 assuming a violation was established.

### c. Misapplication of Payments

The Plaintiffs also allege that the Defendants violated RESPA in misapplying payments on the loan. It is undisputed that the Plaintiffs made a monthly payment of $1,215 on approximately 16 occasions, and the Defendants incorrectly applied a payment of only $1,210.68. The total error, without interest, equals approximately $70. Although the parties admit that the actual payments made were higher than stated, the Plaintiffs have failed to allege which specific provision of RESPA was

MEMORANDUM DECISION - 22

violated by this failure. RESPA does contain a provision regarding the misapplication of payments in 12 U.S.C. § 2605(d), but this provision is limited to payments made during a transfer period. A better argument may be that the Defendants' error is further evidence of failure to properly respond to the Qualified Written Request. This issue will be addressed below. The Court agrees, however, that this error will need to be corrected before determining the total amount of Lawrence's claim.

### d. Failure to Provide a Controlled Business Notice

Pursuant to 12 U.S.C. § 2607(c), affiliated business arrangements are not impermissible so long as a proper disclosure is made of the existence of such an arrangement. 12 U.S.C. § 2607(c)(4)(A). Proper disclosure is made through a Controlled Business Arrangement Disclosure.

The term "affiliated business relationship" is defined in part as "the relationship among business entities where one entity has effective control over the other." 24 C.F.R. § 3500.15(c)(2); see also 12 U.S.C. § 2602(7). It is undisputed that Excel was owned by Lawrence. Thus, Excel and Lawrence had an affiliated business relationship. It is also undisputed that disclosure of this relationship by a Controlled Business Arrangement Disclosure was not given. Thus, a RESPA violation occurred unless the Defendants can establish that they meet a safe harbor.

According to 12 U.S.C. § 2607(d)(3), "[n]o person or persons shall be liable for a violation of the provisions of subsection (c)(4)(A) of this section if such persons or persons proves by a preponderance of the evidence that such violation was not intentional and resulted from a bona fide error notwithstanding maintenance of procedures that are reasonably adapted to avoid such error." 12 U.S.C. § 2607(d)(3).

As stated above, a failure is not the result of a bona fide error where the only excuse is that the violator was unaware that he was required to comply. The Defendants have not established that the failure to provide the Controlled Business Arrangement Disclosure was unintentional. The Defendants failed to provide the notice simply because they did not believe it was required. This excuse is not sufficient. However, as with 12 U.S.C. § 2609, there is no private right of action for violation of 12 U.S.C. § 2607, so the Plaintiffs have no entitlement to damages for this violation.

MEMORANDUM DECISION - 23

### e. Failure to Respond to the Qualified Written Request

RESPA imposes a duty on a loan servicer to timely respond to a borrower's inquiries regarding the servicing of their loan. See 12 U.S.C. § 2605(e). If the servicer fails to respond properly to such a request, the statute entitles the borrower to recover actual damages and, if there is a "pattern or practice of noncompliance," statutory damages of up to $1,000. 12 U.S.C. § 2605(f)(1).

The Plaintiffs submitted a Qualified Written Request (QWR) to Lawrence on or about October 29, 2009. The QWR requested substantial information pertaining to this loan, including a detailed mortgage payment history, the escrow balance, the entire loan and escrow files, HUD-1 Settlement Statements and copies of the loan origination documents. Under RESPA, Lawrence then had 20 days to acknowledge the request and 60 days to respond. 12 U.S.C. § 2605(e).

The Defendants argue that they did respond to the QWR on November 2, 2009, with an accounting of the requested loan payoff amounts. Although the Defendants did submit a response, the response was clearly incomplete. A violation of 12 U.S.C. § 2605(f) occurs when a servicer who receives a QWR either fails to respond or provides an inadequate response. See Bradford v. HSBC Mortg. Corp., 829 F.Supp.2d 340, 352 (E.D. Va. 2011). In this case, no evidence was provided to indicate that copies of the Defendants' loan file, signed copies of the closing papers, and construction account balance were sent as requested. Further, Lawrence supplied them with a payoff and breakdown of principal and interest indicating the Plaintiffs had paid interest on the loan in 2008 of $8,839.61, which differed from the amount of interest Lawrence stated as the interest paid on the IRS Form 1098 of $8,913.45. As stated above, this response also incorrectly identified the payment received as $1,210.68 on 16 occasions. The Court finds Lawrence's response to be inadequate. Thus, the Plaintiffs have established a violation of RESPA.

### f. Damages

For the RESPA violation, the Plaintiffs are entitled to their actual damages, plus "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $1,000." 12 U.S.C. § 2605(f)(1). The actual

MEMORANDUM DECISION - 24

damages for the RESPA violations are the amount paid by the Plaintiffs to attorney Wenger to prepare the Qualified Written Request, or $180. Additional statutory damages of $1,000 are also warranted for the haphazard manner in which Lawrence maintained his accounts and the continuous failure to give the Plaintiffs required disclosures. Accordingly, the Plaintiffs are entitled to total damages for the RESPA violations of $1,180.

### B.  Washington State Statutory Claims

#### 1.  Usury

In accordance with RCW 19.52.020, an interest rate that exceeds 12% per annum is deemed usurious. RCW 19.52.020(1). The Plaintiffs provided uncontradicted testimony that the APR of this loan exceeded 12% per annum. If the construction holdback is included, the APR exceeded 20%. Either way, the loan is usurious. The Defendants did not present any evidence challenging these figures. Instead, the Defendants argue that the transaction was exempt and is time barred.

The Defendants first argue that the Plaintiffs cannot claim that this transaction violates RCW 19.52.020 because the Plaintiffs have also alleged that the claim is covered by the Washington Consumer Loan Act (CLA). The legislature enacted the CLA to ensure credit availability to borrowers with higher than average credit risks by allowing certain lenders to charge interest at higher rates subject to certain conditions. See Bell v. Muller, 129 Wn.App. 177, 186-87, 118 P.3d 405, 409 (2005). A person licensed under the CLA may lend money at a rate that does not exceed 25 percent per annum. RCW 31.04.105(1). However, no one may make loans at this higher rate without first obtaining a license. RCW 31.04.035. At trial, the Plaintiffs indicated that they are no longer pursuing a claim for violations of the CLA and are instead limiting recovery to a violation of the usury statute (RCW 19.52). The Defendants have not provided any evidence that they are licensed under the CLA and therefore exempt from the usury laws. Accordingly, the CLA is not a valid defense to the usury violation.

The Defendants further argue that a statutory usury claim is time barred. The statute of limitations under RCW 19.52.032 provides that "[n]o such action shall be commenced after six months

MEMORANDUM DECISION - 25

following the date the final payment becomes due, whether by acceleration or otherwise, nor after six months following the date the principal is fully paid, whichever first occurs." RCW 19.52.032.

It is uncontested that the balloon payment was due on April 1, 2008. Thus, the final payment was due by April 1, 2008. A claim based on usury therefore had to be filed within six months of that date, or October 1, 2008. The complaint in this case was not filed until April 27, 2010, and the usury claim was not asserted until the filing of the First Amended Complaint in September 2010. The usury claim is therefore untimely.

In closing, however, the Plaintiffs argued that the statute of limitations was extended by a letter sent to the Plaintiffs by a law firm representing Lawrence dated January 23, 2009. RCW 19.52.032 "contemplates that the date on which a final payment may be due can be changed by later events or by agreement of the parties," so that the final date under the statute would be extended when a lender continues to accept payments even after the due date. Gemperle v. Crouch, 44 Wn.App. 772, 776, 724 P.2d 375, 378 (1986).

The letter dated January 23, 2009, stated that the Plaintiffs were in default and provided that the Plaintiffs must tender the default amount owing by February 26, 2009, or risk the possibility of further action including notice of a trustee sale. Even if this letter did extend the statute of limitations, six months from February 26, 2009, is August 26, 2009. As the complaint was not filed until April 27, 2010, it would still be time barred. The same is true of other later events that occurred in this case. According to the payoff statement submitted as Plaintiffs' Exhibit 47, the last payment made by the Plaintiffs was May 5, 2009. Six months from that date is November 5, 2009. The last Notice of Trustee Sale indicated a reinstatement date of October 19, 2009. Even if this notice did extend the final payment due date, the claim is still untimely, as six months from October 19, 2009, is April 19, 2010. Again, the complaint in this case was not filed until April 27, 2010, and a usury claim not asserted until September, 2010. The Court concludes that the Plaintiffs' claim for usury is time barred.

The Plaintiffs also seek to employ the doctrine of equitable tolling to allow this claim. Equitable tolling may be appropriate in certain circumstances to suspend the limitations period if justice requires

MEMORANDUM DECISION - 26

it.  See In re Carlstad, 150 Wn.2d 583, 593, 80 P.3d 587, 591 (2003).  "Equitable tolling is generally used only sparingly, when the plaintiff exercises diligence and there is evidence of bad faith, deception, or false assurances by the defendant."  Carlstad, 150 Wn.2d at 593.  The party asserting equitable tolling bears the burden of proof.  See Nickum v. City of Bainbridge Island, 153 Wn.App. 366, 379, 223 P.3d 1172, 1178 (2009).

The Court is not aware of any Washington State cases applying equitable tolling to allow an untimely usury claim under RCW 19.52.  Even if equitable tolling is permissible, however, the Court concludes that equitable tolling is not applicable to the usury claim in this case.

The Plaintiffs argue that equitable tolling should be applied to the facts of this case because they never received a Final HUD-1 Settlement Statement listing the APR.  As they did not receive this document, they argue that they were unable to discover that the rate of interest was usurious in order to timely assert a claim.  Although it is unclear when or whether a signed Final HUD-1 Settlement Statement was ever provided to the Plaintiffs, it is undisputed that the APR was disclosed on various other documents admittedly received by the Plaintiffs, such as the unsigned documents received at closing.  The Plaintiffs testified that they believed such documents were identical to the signed documents.  While the Plaintiffs may not have fully understood the charges, there is no evidence that the Defendants ever "concealed" the APR or that the Plaintiffs were prevented from timely asserting their rights.  Further, the evidence indicates that the Plaintiffs first contacted an attorney in the fall of 2009, and filed their first complaint against the Defendants in U.S. District Court for the Western District of Washington on October 30, 2009.  At that time, relief was not requested under RCW 19.52.  In fact, no usury claim was asserted until the First Amended Complaint was filed in this Court in September, 2010.  There is no basis for equitable tolling of the statute of limitations of this claim.

The Court concludes that the Plaintiffs' claim for usury is time barred.  Thus, the Plaintiffs are unable to seek any affirmative relief on this claim.  See Mackey v. Maurer, 153 Wn.App. 107, 112-13, 220 P.3d 1235, 1237 (2009).  This conclusion, however, does not end the analysis.  As with the federal statutory claims, there may be an argument that the Plaintiffs are able to raise usury as a

MEMORANDUM DECISION - 27

defense to Lawrence's proof of claim through recoupment. The Court was able to find very little case law addressing this issue, and no controlling authority in the Ninth Circuit or Washington State. As admitted by both parties, there is controlling authority that the Plaintiffs may be able to raise the statutory usury claim through the CPA. Accordingly, the Court will address this claim in the CPA section of the Memorandum Decision.

### 2. **Mortgage Brokers Practices Act**

The Plaintiffs claim that the Defendants also violated the MBPA. According to the Plaintiffs, Spooner violated the MBPA in failing to be licensed, and the Defendants violated the MBPA in failing to provide required disclosures.

The MBPA applies to the "brokering of residential real estate loans." RCW 19.146.005. A "residential mortgage loan" is defined in part, as a "loan primarily for personal, family, or household use secured by a mortgage or deed of trust on residential real estate." RCW 19.146.010(19).[5]

Pursuant to RCW 19.146.200(1): "A person, unless specifically exempted from this chapter under RCW 19.146.020, may not engage in the business of a mortgage broker or loan originator without first obtaining and maintaining a license under this chapter." There is no dispute that Spooner held himself out as a mortgage broker or loan originator and was not licensed under the MBPA. As this was a consumer loan, Spooner violated the MBPA.

Lawrence argues that he is exempt from the MBPA as a private lender. At the time this loan was entered into, RCW 19.146.020(1)(d) provided that "[a]ny person making or acquiring a residential mortgage loan solely with his or her own funds for his or her own investment without intending to resell the residential mortgage loans" is exempt from this chapter. RCW 19.146.020(1)(d). Lawrence used his own funds for this loan and there is no evidence that he intended to resell it. Accordingly, the Court concludes that Lawrence was exempt from the licensing requirements of the MBPA.

---

[5] At the time this loan was entered into this section was designated as RCW 19.146.010(14).

RCW 19.146.020(2) further provided, however, that those persons otherwise exempt under RCW 19.146.020(1)(d), must still comply with RCW 19.146.0201. According to RCW 19.146.0201, as in effect when this loan transaction was entered into, it is a violation of the MBPA for a "loan originator, mortgage broker required to be licensed under this chapter, or mortgage broker otherwise exempted from this chapter under RCW 19.146.020(1)(d) of (f) in connection with a residential mortgage loan to . . . (6) Fail to make disclosures to loan applicants and noninstitutional investors as required by RCW 19.146.030 and any other applicable state or federal law." RCW 19.146.0201(6). Further, under RCW 19.146.0201, as in effect when the loan was entered into, it is also a violation of the MBPA to fail to comply with any requirement of TILA, Regulation Z, or RESPA. RCW 19.146.0201(10).

The Court has already determined that the Defendants failed to provide the required TILA and HOEPA disclosures to the Plaintiffs. It is further undisputed that the Defendants failed to provide the disclosures required by the MBPA. See RCW 19.146.030(1), (2)(a) and (b). Accordingly, the Defendants are liable for violations of the MBPA: Spooner for failing to be licensed and Lawrence for failing to comply with the disclosure requirements.

Similar to the usury claim, the Defendants argue that the Plaintiffs cannot maintain an action under the MBPA because they originally asserted that the Defendants were acting under the authority of the CLA. As stated above, the Plaintiffs have voluntarily dismissed the CLA claim. More importantly, although a lender that is licensed under the CLA is exempt from all provisions of the MBPA, the Defendants have not provided any evidence that they were licensed under that section. See RCW 19.146.020.

The Defendants also argue that the MBPA claim is time barred. An action for violation of the MBPA must be brought within one year of the alleged violation. RCW 19.146.240(2)(a). This loan was entered into in October, 2006. The first time a claim under the MBPA was raised was over two years later with the filing of the U.S. District Court complaint, which was later dismissed. As set forth above, no reason has been articulated as to why equitable tolling would apply. The MBPA claim is therefore stale. As with usury, the Court is unaware of any controlling authority indicating that the

MEMORANDUM DECISION - 29

MBPA claim is still available through recoupment.  However, also as with the usury claim, the issue of whether the Plaintiffs may assert this claim under the CPA will be addressed below.

### 3. <u>Washington Consumer Protection Act</u>

#### a. *Liability*

The Defendants admit that a stale claim may still be used to support a timely asserted CPA claim.  <u>See</u> <u>Anderson v. Wells Fargo Home Mortg., Inc.</u>, 259 F.Supp.2d 1143, 1147 n.3 (W.D. Wash. 2003).   Although stale, the evidence before the Court is that the loan transaction violated the Washington State usury statute and the MBPA.  Each of these violations are per se violations of the CPA.  <u>See</u> RCW 19.52.036 (usury); RCW 19.146.100 (MBPA).

To prevail on a CPA claim, the plaintiff must establish that (1) the defendant has engaged in an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) the plaintiff has suffered injury in his or her business or property, and (5) a causal link exists between the unfair or deceptive act and the injury suffered.  <u>Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.</u>, 105 Wn.2d 778, 784-85, 719 P.2d 531, 535 (1986).

The first two elements may be established by a showing that the alleged act constitutes a per se unfair trade practice. A per se unfair trade practice exists when a statute that has been declared by the legislature to constitute an unfair or deceptive act in trade or commerce has been violated. <u>Hangman Ridge</u>, 105 Wn.2d at 786.  As stated above, the Plaintiffs have demonstrated that the Defendants have committed per se violations of the CPA.  The public interest requirement may also be satisfied per se by showing that the statute violated contains a specific declaration of public impact. <u>Hangman Ridge</u>, 105 Wn.2d at 791.  Both the usury statute and the MBPA contain declarations of public policy which meet the per se public interest requirement.   <u>See</u> RCW 19.52.005; RCW 19.146.100.  Thus, the only elements at issue are the fourth and fifth elements of the CPA.

The injury element of the CPA is met "if the consumer's property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal."  <u>Mason v. Mortg. Am., Inc.</u>, 114 Wn.2d 842, 854, 792 P.2d 142, 148 (1990).  The Plaintiffs

MEMORANDUM DECISION - 30

have established injury to their property due to the deceptive acts committed. For instance, the Plaintiffs were monetarily injured in this loan transaction in paying a usurious rate of interest in violation of RCW 19.52. For purposes of the CPA, "unlawful interest is a financial injury." Cuevas v. Montoya, 48 Wn.App. 871, 878, 740 P.2d 858, 862 (1987). The Plaintiffs were also injured financially by this loan transaction which required fees, such as the construction holdbacks, that were never provided to them. Accordingly, the Plaintiffs have established the Defendants' liability under the CPA.

### b. Damages

A party injured by a CPA violation may recover his or her actual damages, together with the costs of the suit, including a reasonable attorney's fee. In addition, the Court may, in its discretion, award treble damages of three times the amount of the actual damages sustained. RCW 19.86.090. At the time this loan transaction was entered into, the exemplary damage award was limited to $10,000. Although RCW 19.86.090 currently caps exemplary damages at $25,000, this increased amount did not come into effect until 2009. See Laws of 2009, ch. 371, § 1 (effective July 26, 2009). Washington courts have determined that the increased amount of exemplary damages allowed by RCW 19.86.090 does not apply retroactively because it creates a new liability and is not simply remedial in nature. Payless Car Rental Sys., Inc. v. Draayer, 43 Wn.App. 240, 246 n.1, 716 P.2d 929, 933 (1986); Swain v. Colton, 44 Wn.App. 204, 206, 721 P.2d 990, 991 (1986).

In regard to the usury violation, the actual damages incurred by the Plaintiffs equal the amount of interest paid by the Plaintiffs in excess of 12%. The best evidence before the Court is that the Plaintiffs paid interest in excess of 12% of $9,416 per year. This amount is based on an estimated APR of 20% and a principal loan amount of $117,700. As they made payments on this loan for approximately two and a half years, the actual damages total $23,540.

The Court recognizes that this amount is not exact, as it does not account for any reduction in principal. These are the only figures and thus the only evidence, however, that have been provided to the Court. In addition, Washington courts recognize that once liability has been established, the

MEMORANDUM DECISION - 31

precise amount of damages need not be shown with mathematical certainty.  Erdman v. Lower Yakima Valley, Wash. Lodge No. 2112 of B.P.O.E., 41 Wn.App. 197, 208, 704 P.2d 150, 157 (1985).

In regard to the MBPA violations, the Plaintiffs seek actual damages in the amount of fees paid. An award equal to the fees paid has already been awarded the Plaintiffs as part of the HOEPA damage award.  Thus, the Plaintiffs are not entitled to an additional damage award of actual damages under the MBPA.  See, e.g., Waldron v. A+ Plus Cash, LLC (In re Denney), 2007 WL 4302770, at *8 (Bankr. W.D. Wash. Dec. 6, 2007) (refusing to grant duplicate damages under both TILA and the CPA for the same disclosure violations).

As stated above, the Court also has the discretion to award treble damages of three times the amount of actual damages sustained, up to $10,000 dollars.  See RCW 19.86.090.  Due to the number and extent of both federal and state statutory violations present in this case, the Court concludes that treble damages are warranted in this case.  The actual damages sustained for the usury violation total $23,540.  The Plaintiffs are therefore entitled to the maximum award for treble damages for the usury violation of $10,000.

Although an additional damage award for actual damages under the MBPA is not warranted as duplicative, this does not answer the question of whether an exemplary damage award for the MBPA violation is allowed.  It appears from the pleadings submitted that the Plaintiffs are requesting an exemplary damage award for each CPA violation found.  This Court agrees that a separate exemplary damage award for multiple CPA violations is sometimes permissible.  In Edmonds v. John L. Scott Real Estate, Inc., 87 Wn.App. 834, 942 P.2d 1072 (1997), the Washington State Court of Appeals determined that "multiple awards of exemplary damages are not authorized by the statute where more than one CPA violation results in a single harm."  Edmonds, 87 Wn.App. at 850.  In Edmonds, two violations of the CPA resulted in only a single injury, the loss of $5,001 in earnest money.  In this case, the violations of the CPA resulted in two separate injuries: (1) excess interest paid for the usury violation, and (2) damages in the amount of fees paid for the MBPA violation.  Accordingly, the Court

MEMORANDUM DECISION - 32

awards an exemplary damage of $10,000 for the usury violation and $10,000 for the MBPA violation, for a total of $20,000 in exemplary damages.

On a final note, the Plaintiffs also appear to seek an award of damages pursuant to the CPA for each of the federal statutory claims previously discussed. However, contrary to the statements made by the Plaintiffs in their pleadings, this Court is not aware of a single Washington State case finding that a violation of TILA, HOEPA or RESPA is a per se violation of the CPA. In fact, case law from other jurisdictions interpreting similar consumer protection act statutes, indicate that the majority of courts that have addressed this issue have determined that violations of these federal statutes are not a per se violation. See, e.g. Morilus v. Countrywide Home Loans, Inc., 651 F.Supp.2d 292, 309 (E.D. Pa. 2008) (violations of TILA and RESPA are not per se violations of the Pennsylvania consumer protection act); Riopta v. Amresco Residential Mortg. Corp., 101 F.Supp.2d 1326, 1333-34 (D. Haw. 1999) (violation of TILA is not a per se violation of the Hawaii consumer protection act.).

In addition, even if the federal violations were per se violations of the CPA or otherwise actionable under that statute, as discussed above, the federal violations in this case come into the CPA through the MBPA. See RCW 19.146.020 and RCW 19.146.0201; see also Brazier v. Sec. Pac. Mortg., Inc., 245 F.Supp.2d 1136, 1142 (W.D. Wash. 2003). Exemplary damages pursuant to the CPA have already been awarded for the MBPA violation. Under the reasoning of the Edmonds case, an additional exemplary damage award for the federal violations should not be granted. Edmonds, 87 Wn.App. at 850. Furthermore, the Court does not believe that the facts of this case warrant an exemplary damage award beyond the $20,000. Although it is unquestionable that the Defendants failed to comply with both federal and state law in regard to this loan transaction, the Plaintiffs also clearly received a benefit. This loan allowed the Plaintiffs to save their home from imminent foreclosure by Centex. Through the loan proceeds, the Plaintiffs were able to pay off pending debts, including an unsatisfied judgment. The Court is also mindful of the fact that the Plaintiffs have not made a payment on this loan in approximately three years, while still residing in the home, and now seek to substantially reduce Lawrence's proof of claim. Although the Court is not condoning the

MEMORANDUM DECISION - 33

Defendants' actions in this case, the Court recognizes that the equities of this case are not clearly cut in the Plaintiffs' favor. The damages awarded, including the possibility of additional damages in the form of attorneys' fees, are a sufficient deterrent. Accordingly, this Court concludes that the Plaintiffs are entitled to actual damages under the CPA of $23,540 and exemplary damage awards of $20,000, for a total of $43,540.

### C. Common Law Causes of Action

The Plaintiffs have also alleged the following common law claims: unconscionability, civil conspiracy, breach of fiduciary duty, misrepresentation and fraud, breach of good faith and fair dealing, breach of contract, and attorney fees. Several of these are common law contract claims and several arise in tort. The Defendants argue that such claims are duplicative and should be denied as already addressed by statute. The Plaintiffs admit that these are alternative theories for relief and that they are not entitled to, nor are they seeking, double recovery.

#### 1. <u>Unconscionability</u>

Washington courts recognize two forms of unconscionability. Substantive unconscionability exists in those cases where a contract clause or term is one-sided or overly harsh. Procedural unconscionability relates to impropriety during the formation of a contract and whether there was blatant unfairness in the bargaining process and a lack of meaningful choice. <u>Luna v. Household Fin. Corp. III</u>, 236 F.Supp.2d 1166, 1174-75 (W.D. Wash. 2002). Procedural unconscionability is determined in "light of the totality of the circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms, and (3) whether the terms were 'hidden in a maze of fine print.'" <u>Mattingly v. Palmer Ridge Homes LLC</u>, 157 Wn.App. 376, 388, 238 P.3d 505, 511 (2010) (quoting <u>Torgerson v. One Lincoln Tower, LLC</u>, 166 Wn.2d 510, 518-19, 210 P.3d 318, 322 (2009)).

The Plaintiffs allege the agreement was unconscionable because they were induced to enter into a contract without necessary and material disclosures. The Plaintiffs do not specify whether this amounts to procedural or substantive unconscionability. The Court, however, does not find that this

agreement rises to the level of either procedural or substantive unconscionability. Although the terms of this loan were onerous, the Plaintiffs admit that they could have sought relief earlier from other lenders. This loan allowed them to pay off existing debt and to avoid imminent foreclosure. Mr. Bryce further testified that he was aware that the loan had disadvantageous terms, including the prepayment penalty and balloon payment, prior to entering into the loan transaction. In addition, the Plaintiffs could have, but elected not to seek legal counsel. The fact that certain federally required disclosures were not provided does not render the agreement per se unconscionable.

### 2. Civil Conspiracy

In order to prove civil conspiracy, the Plaintiffs must prove that (1) two or more people engaged in activity to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means; and (2) an agreement existed among such people to accomplish the object of the conspiracy. Wilson v. State, 84 Wn.App. 332, 350-51, 929 P.2d 448, 459 (1996). The Plaintiffs have alleged that the Defendants acted in concert and wrongfully conspired with one another to induce the Plaintiffs to enter into a consumer mortgage transaction that they could not afford, which inured to the Defendants' benefit in the form of increased fees, finance charges, loan expenses, and a usurious interest rate.

As stated above, the Defendants failed to adequately disclose the affiliated relationship between Lawrence and Excel. However, such failure does not rise to the level of civil conspiracy. There is insufficient evidence that the Defendants purposefully hid this relationship from the Plaintiffs in order to accomplish an unlawful purpose or lawful purpose by unlawful means. The civil conspiracy claim fails.

### 3. Breach of Fiduciary Duty

"The general rule in Washington is that a lender is not a fiduciary of its borrower; a special relationship must develop between a lender and a borrower before a fiduciary duty exists." Miller v. U.S. Bank of Wash., N.A., 72 Wn.App. 416, 426-27, 865 P.2d 536, 543 (1994). A fiduciary relationship may develop if one party occupies such a relation to the other party that the other party justifiably

expects that his interests will be cared for.  <u>Liebergesell v. Evans</u>, 93 Wn.2d 881, 889-90, 613 P.2d 1170, 1175 (1980).

There are few reported cases in Washington where a fiduciary relationship was found to exist between a lender and a borrower.  <u>Liebergesell</u> addressed the opposite situation from this case and examined whether a borrower had a fiduciary duty to its lender.  In <u>Liebergesell</u>, the lender was an unsophisticated widowed school teacher with no business experience.  The lender regarded the borrower as a financial counselor and guide.  The Washington State Supreme Court recognized that a fiduciary relationship can arise in fact regardless of the relationship in law between the parties.  The facts in that case were sufficient to raise a question of fact preventing summary judgment.  The court in <u>Liebergesell</u> cited to several other cases where the facts were sufficient to establish a right to rely. In each of these cases, there was evidence of either a lack of business expertise, friendship between the parties, or the lender assumed the role of adviser.  <u>See</u> <u>Liebergesell</u>, 93 Wn.2d at 891, and the cases cited therein.

The Plaintiffs have not alleged any facts to indicate that a "special relationship" existed between the parties in this case.  There is no evidence of a friendship between the parties, and based on the prior Centex transaction, the Plaintiffs did have some lending experience.  There is no evidence that the Plaintiffs relied on the Defendants as financial advisers.  Rather, the Plaintiffs appear to allege an exception to the general rule that a lender is under no fiduciary obligation to its borrower, based solely on the Plaintiffs' lack of sophistication and the apparent trust they placed in Spooner.  Such evidence is insufficient to establish a claim for breach of fiduciary duty on the part of Lawrence, particularly when all of the evidence indicates that Lawrence never had any direct communication or contact with the Plaintiffs prior to entering into the transaction.  To conclude a lender is a fiduciary in simple residential loan transactions would place an undue burden on lenders and further impede the granting of residential loans.  The Plaintiffs have failed to establish a claim for breach of fiduciary duty.

MEMORANDUM DECISION - 36

### 4. **Misrepresentation and Fraud**

The Plaintiffs have also alleged a common law tort claim for misrepresentation and fraud. In order to establish an intentional misrepresentation or fraud claim, the plaintiff must establish: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of the falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representations; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff. Stiley v. Block, 130 Wn.2d 486, 505, 925 P.2d 194, 204 (1996). Fraud must be established by clear, cogent and convincing evidence. Stiley, 130 Wn.2d at 505.

The Defendants argue that the Plaintiffs' claim for misrepresentation and fraud fails because: (1) the required elements have not been established; (2) the claim is barred by the economic loss rule and/or already provided for by statute; and/or (3) the claim is barred by the statute of limitations.

The Plaintiffs argue that the Defendants committed fraud by failing to disclose material facts. Although it is undisputed that many federally and state mandated disclosures were not provided, this failure does not rise to the level of fraud. Evidence of the Defendants' knowledge of the nondisclosures and intent is lacking, as well as evidence of the Plaintiffs' reliance. The Plaintiffs admit that they had little or no other options for saving their home from foreclosure. Mr. Bryce admitted under oath that he understood that this loan contained many disadvantageous terms. Further, it is undisputed that Lawrence never had any direct contact with the Plaintiffs. Thus, it is difficult to link Lawrence to any alleged misrepresentations made. The Court agrees with the Defendants that the Plaintiffs have failed to establish conduct rising to the level of common law fraud in this case.

### 5. **Breach of Good Faith and Fair Dealing**

In every contract there is an implied duty of good faith and fair dealing. Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356, 360 (1991). This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance. Badgett, 116 Wn.2d at 569.

The Plaintiffs allege that the Defendants breached this duty for the same reasons set forth in the breach of contract and breach of fiduciary duty claims. As this claim does not appear to contain

MEMORANDUM DECISION - 37

any allegations conceptually separate from the other claims, the Court will not analyze it as a distinct claim. See Badgett, 116 Wn.2d at 569 (the implied duty of good faith and fair dealing "arises only in connection with terms agreed to by the parties.")

### 6. **Breach of Contract**

The Plaintiffs allege that Lawrence is liable for breach of contract. To prevail on a breach of contract claim, the plaintiff must show an agreement between the parties, breach, and resulting damage. Lehrer v. Dept. of Social & Health Servs., 101 Wn.App. 509, 516, 5 P.3d 722, 727 (2000).

The Plaintiffs allege that the contract breached in this case is the Promissory Note. The Plaintiffs allege that the Defendants breached the Promissory Note in failing to properly apply payments. As stated above, it is admitted that approximately $70 per payment was not properly applied. This failure, however, has already been addressed in the RESPA section so damages will not be awarded under a breach of contract theory. A breach of contract claim is also questionable because the Plaintiffs have failed to perform their obligation under the contract. In asserting breach of contract, a borrower must establish that they have performed their obligation under the contract or have an excuse for non-performance. See Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45, 49 (1986). It is undisputed that the Plaintiffs defaulted on the note payments and have not made a payment in approximately three years. The Plaintiffs have failed to demonstrate that the Defendants' failure to properly apply a minimal amount per payment was sufficient to excuse the Plaintiffs' non-performance. The Plaintiffs' claim for breach of contract fails.

### D. Summary of Damages

In summary, the Court concludes that the Plaintiffs are entitled to damages based on violations of TILA, HOEPA, RESPA, and usury and the MBPA through the CPA. The following damages are awarded:

| | |
|---|---|
| TILA | $2,000.00 |
| HOEPA | $22,260.89 |
| RESPA | $1,180.00 |

MEMORANDUM DECISION - 38

CPA $43,540.00

**TOTAL:** **$68,980.89**

The issue of whether any additional relief is warranted, including any entitlement to attorneys' fees, shall be separately noted for hearing.

/// End of Memorandum Decision ///